# IN THE UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| CYNTHIA MEDLEY | : |
| Plaintiff, | : CIVIL ACTION |
| v. | : NO. 12-cv-6284 |
| SUGARHOUSE HSP GAMING, L.P. *et al*. | : |
| Defendants. | : |

**MEMORANDUM**

YOHN, J.                                                                                                                               March 21, 2013

       Plaintiff Cynthia Medley brings this action against the following defendants (collectively the "Defendants"): SugarHouse HSP Gaming, L.P., d/b/a SugarHouse Casino, and SugarHouse HSP Gaming Prop. GP, LLC, d/b/a SugarHouse Casino (hereinafter collectively the "Corporate Defendants"); Greg Carlin, David Patent, Wendy Hamilton, and Patricia Tuck (collectively the "Individual Defendants"). Medley's second amended complaint asserts claims of wrongful termination and intentional infliction of emotional distress ("IIED") against Defendants in counts I and II, and a claim of a violation of the Consolidated Omnibus Budget Reconciliation Act of 1985 ("COBRA") against SugarHouse HSP Gaming L.P. in count III. Before me is Defendants' motion to dismiss counts I and II pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure. For the reasons set forth below, I will grant Defendants' motion to dismiss. Dismissal of Medley's wrongful termination claim against Tuck and the Corporate Defendants will be without prejudice to Medley's right to amend her complaint to provide further factual allegations, as long as such allegations can be made in good faith.

I.      **FACTUAL BACKGROUND**

On June 25, 2007, Cynthia Medley was hired as an administrative assistant in the human resources department at SugarHouse Casino. (Sec. Am. Compl. ¶ 10.) Later, Medley was promoted to the position of human resources representative. (*Id*. ¶ 11.) Her duties included processing paperwork for new employees, performing employee background checks with the Pennsylvania State Police, and assisting new employees in securing gaming licenses from the Pennsylvania Gaming Control Board. (*Id*. ¶ 12.) Medley asserts that she was authorized to work from her home, and because of her administrative duties was also authorized to remotely access SugarHouse Casino's database and documents. (*Id*. ¶ 13.)

In March 2010, Medley reported to SugarHouse Casino general manager Wendy Hamilton that her immediate supervisor, Joann Weber, was creating a hostile work environment. (*Id*. ¶¶ 14, 16.) Despite her complaint, Medley alleges that Defendants did not take any action to remedy the situation. (*Id*. ¶ 20.) As a result of Weber's "harassing and degrading personal comments, [] profane and abusive language, [] and constant threats to terminate [Medley's] employment without justification," Medley suffered severe emotional distress that resulted in her experiencing a stroke in July 2010. (*Id*. ¶¶ 17, 22.) Due to her stroke, Medley missed approximately one month of work, returning to work in late August. (*Id*. ¶ 25.)

Between August and September 2010, SugarHouse Casino began preparing for its grand opening. (*Id*. ¶ 26.) So as not to delay the opening of the casino, Weber allegedly ordered Medley to falsify information and forge signatures and notary seals on such documents as I-9 forms and state license applications in order to complete employee background checks with the Pennsylvania State Police and expedite the receipt of gaming licenses. (*Id*.) Fearful of

2

retaliation, Medley complied with Weber's order to forge the documents. (*Id*. ¶ 28.) Because Defendants did not act on her previous complaints, Medley decided not to report Weber's actions to her superiors. (*Id*. ¶ 29.)

SugarHouse Casino held its grand opening on September 23, 2010. (*Id*. ¶ 31.) For reasons unknown to Medley, Defendants terminated Weber's employment on September 24, 2010. (*Id*. ¶ 32.) No longer under the threat of retaliation, Medley contacted Hamilton on September 27, 2010, to request a meeting to discuss Weber's unethical and illegal conduct. (*Id*. ¶ 33.) Medley alleges that Hamilton refused to meet with her, and instead attempted to conceal Weber's criminal misconduct. (*Id*. ¶ 34.)

Between December 2010 and January 2011, Medley discovered that Defendants continued to maintain and rely upon the falsified and forged documents presented to the Pennsylvania State Police and Pennsylvania Gaming Control Board. (*Id*. ¶¶ 36-37.) For that reason, on February 17, 2011, Medley contacted Patricia Tuck, her new supervisor and the vice president of human resources, to request a meeting to discuss Weber's conduct. (*Id*. ¶ 38.) Medley alleges that Defendants again refused her request for a meeting and continued to conceal Weber's illegal and unethical behavior. (*Id*. ¶ 40.) In addition to denying a meeting, Medley avers that Tuck initiated an investigation to determine if Medley was sending SugarHouse Casino data or other internal documents outside of the company. (*Id*. ¶ 42.)

On March 2, 2011, Medley contacted Greg Carlin, SugarHouse Casino's chief executive officer, and requested a meeting to discuss Weber's conduct. (*Id*. ¶ 43.) Carlin held a meeting with Medley that same day. (*Id*. ¶ 45.) Also present for the meeting was David Patent, SugarHouse Casino's chief operating officer. (*Id*.) At the conclusion of the meeting, Carlin

directed Medley to contact Michael Sklar, an attorney for SugarHouse Casino. (*Id*. ¶ 47.) Medley contacted Sklar, and on March 10, 2011, the two met in his car at an offsite location in Philadelphia. (*Id*. ¶¶ 49-50.) After listening to Medley's concerns, Sklar informed her that he would look into the matter. (*Id*. ¶ 52.) Medley alleges that such an inquiry never occurred. (*Id*. ¶ 53.)

On March 11, 2011, Tuck delivered a bonus check to Medley "for a job well done." (*Id*. ¶ 55.) Because she felt that this money was intended as a payoff, Medley refused to accept the check. (*Id*. ¶ 58.) Then, in mid-March, Tuck suspended Medley's employment, claiming that there was an on-going investigation into whether Medley had sent SugarHouse Casino data and documents outside of the company. (*Id*. ¶ 59.) Medley steadfastly denies sharing any data or documents with unauthorized individuals outside of the company, but maintains that she was allowed to access data and documents remotely by virtue of her authorization to work from home. (*Id*. ¶ 60.)

On April 14, 2011, Tuck scheduled a meeting with Medley in a hotel room in Philadelphia and informed Medley that her employment with SugarHouse Casino was being terminated for her violation of the company's "Electronic Technologies and Services" and "Confidentiality" policies. (*Id*. ¶¶ 61-62.) Medley claims that these policies did not exist at the time of her hiring, and that at no time did SugarHouse Casino ever communicate these policies to her. (*Id*. ¶ 64.) Before allowing Medley to leave the meeting, Tuck forced her to access her personal email account and delete all incoming and outgoing emails regarding Defendants' misconduct. (*Id*. ¶ 65.)

Defendants offered Medley a severance package in conjunction with her termination. (*Id*.

¶ 66.) The package included two months' salary as long as she released any potential action against Defendants. (*Id*.) Also following her termination, Defendants failed to inform Medley of her ability to continue health insurance coverage under COBRA. (*Id*. ¶ 67.) Because she was not aware of her health insurance option under COBRA, Medley claims that she was unable to seek necessary medical care. (*Id*. ¶ 68.)

II.     **STANDARD OF REVIEW**

In deciding a motion to dismiss under Rule 12(b)(6), courts must "accept all factual allegations as true, construe the complaint in the light most favorable to the plaintiff, and determine whether, under any reasonable reading of the complaint, the plaintiff may be entitled to relief." *Phillips v. Cnty. of Allegheny*, 515 F.3d 224, 233 (3d Cir. 2008) (internal quotation marks and citation omitted). The pleading standard of Rule 8 "demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements" will not suffice. *Id.* at 678 (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)). The complaint must contain sufficient factual matter to be plausible on its face. *See id.* "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged"; a sheer possibility that a defendant acted unlawfully is not sufficient. *Id.* Therefore, to survive a motion to dismiss, a plaintiff must allege facts sufficient to "nudge[] [his or her] claims across the line from conceivable to plausible." *Twombly*, 550 U.S. at 570.

III.    **DISCUSSION**

Defendants challenge counts I and II of Medley's second amended complaint. They argue

5

that her complaint contains insufficient factual allegations to support a wrongful termination and IIED claim. For the following reasons, I agree that Medley's second amended complaint should be dismissed with respect to counts I and II.

### A. Count I: Wrongful Termination

In count I of her second amended complaint, Medley claims that Defendants wrongfully terminated her employment because of her refusal to assist Defendants in concealing their past criminal misconduct and engage in further ongoing criminal misconduct. Defendants argue that Medley fails to allege sufficient factual allegations to support a claim for wrongful discharge under the public policy exception to Pennsylvania's at-will employee doctrine. They also argue that the wrongful termination claim must be dismissed against the Individual Defendants because there is nothing alleged in the complaint that would support a theory of individual liability.

Under Pennsylvania law, "the presumption of all non-contractual employment relations is that it is *at-will* and that this presumption is an extremely strong one. An employee will be entitled to bring a cause of action for a termination of that relationship only in the most limited of circumstances where the termination implicated a clear mandate of public policy in this Commonwealth." *McLaughlin v. Gastrointestinal Specialists, Inc.*, 750 A.2d 283, 288 (Pa. 2000). To successfully state a claim for wrongful termination, an at-will employee "must allege that some *public* policy of *this* Commonwealth is implicated, undermined, or violated because of the employer's termination of the employee." *Id*. at 289. This can be accomplished by pointing to a violation of a "clear policy articulated in the constitution, in legislation, an administrative regulation, or a judicial decision." *Hunger v. Grand Cent. Sanitation*, 670 A.2d 173, 175 (Pa. Super. Ct. 1996). In application, the public policy exception "has been limited to situations in

which an employer: (1) requires an employee to commit a crime; (2) prevents an employee from complying with a statutorily imposed duty; and (3) discharges an employee when specifically prohibited from doing so by statute." *Tanay v. Encore Healthcare, LLC*, 810 F. Supp. 2d 734, 738 (E.D. Pa. 2011).

In this case, it is helpful to first address the wrongful termination claim with respect to the Individual Defendants. After careful review of the case law discussing this topic, it is questionable whether such a claim is possible against any defendants in their individual capacity. *Compare McGuire v. Palmerton Hosp.*, No. 12-cv-1762, 2012 WL 5494924, at *5 (M.D. Pa. Nov. 13, 2012) (finding no wrongful termination claim exists against defendant in individual capacity), *and Hrosik v. Latrobe Steel Co.*, No. 94-1361, 1995 WL 456212, at *6 (W.D. Pa. Apr. 25, 1995) ("A wrongful discharge claim exists only against an employee's employer."), *with Brennan v. Cephalon, Inc.*, No. 04-3241, 2005 WL 2807195, at *13, (D.N.J. Oct. 25, 2005) (finding wrongful termination claim against individuals possible if actions were taken in individual as opposed to corporate capacity), *and DeMuro v. Phila. Housing Auth.*, No. 98-3137, 1998 WL 962103, at *5 (E.D. Pa. Dec. 22, 1998) (allowing wrongful termination claim against individual to proceed, but dismissing on other grounds).[1]

However, even if such a claim is possible, cases supporting such a cause of action are clear that a complaint would have to allege that the individuals acted in an individual or personal capacity as opposed to a corporate capacity. *See, e.g., Brennan*, 2005 WL 2807195, at *13 (citing *Leslie v. Phila. 1976 Bicentennial Corp.*, 332 F. Supp. 83, 93 (E.D. Pa. 1971)). Conduct

---

[1]Because this claim will be dismissed on other grounds, as discussed below, I find it unnecessary to rule at this time whether a wrongful termination claim against individual defendants can survive as a matter of law.

taken in a personal capacity may involve the personal orchestration of a plaintiff's termination or personally asking a plaintiff to partake in a crime and then firing the plaintiff upon refusal. *See id*. In essence, the malfeasance would need to be motivated by personal interest, and thus fall outside the scope of an individual's corporate duties.

Here, there is nothing alleged in the complaint that even suggests Carlin, Patent, or Hamilton acted outside of their corporate capacities. It is not alleged that they personally asked Medley to commit a crime or that they acted in a personal capacity in orchestrating her termination. In fact, the allegations with reference to them refer at all times to conduct by themselves within their corporate roles. Accordingly, the wrongful termination claim against Carlin, Patent, and Hamilton will be dismissed with prejudice as amendment would be futile.

Reading the complaint in the light most favorable to Medley, I find that it is possible, based on Medley's allegations, that Tuck retaliated against Medley for her continued complaints to SugarHouse Casino management and acted in a personal capacity in orchestrating her termination. Although this claim will be dismissed on other grounds, which are discussed below, I will grant Medley leave to amend her complaint, to include her claim against Tuck. I caution Medley, however, that while such a claim against Tuck may be amended to meet the minimum standards of facial plausibility to survive a motion to dismiss, without more substantial factual allegations and evidence with respect to Tuck's alleged personally motivated campaign to terminate Medley's employment, such a claim is unlikely to make it past summary judgment.

Medley's claim against Tuck and the Corporate Defendants eventually fails because she does not identify the Pennsylvania public policy that her termination violates. In order to state a cognizable claim under the public policy exception, Medley "must point to a clear public policy

articulated in the constitution, legislation, an administrative regulation, or a judicial decision." *Brennan*, 2005 WL 2807195, *6. Her allegation that her termination "constitutes a clear violation of public policy," (Sec. Am. Compl. ¶ 76), without identifying the public policy that is violated, is a legal conclusion that does not contain a factual basis sufficient to establish facial plausibility to overcome a motion to dismiss. To overcome a motion to dismiss, Medley needs to allege a specific policy and facts which demonstrate a facial plausibility that it has been violated.

In her response brief, Medley relies on *Clark v. Modern Group Ltd.*, 9 F.3d 321 (3d Cir. 1993), to argue that her "refusal" to engage in the concealment of the falsified documents allows her to fall under the protection of the public policy exception. (Pl.'s Resp. 7.) Specifically, she argues that Defendants' alleged attempts to silence her complaints amount to a requirement that she commit a crime—an enumerated ground for invoking the public policy exception. Furthermore, she invokes language from *Clark* that states that when an employer "seeks to coerce its employees into participating in [illegal] activity or condoning it by silence, the public's interest in exposing unlawful activities overrides the doctrine of employment at-will." *Clark*, 9 F.3d at 331.

Here, Medley's reliance on the *Clark* dicta is not helpful. *Clark* stands for the proposition—irrelevant in this matter—that in order to gain protection under the public policy exception, the conduct complained of must actually be illegal, not simply reasonably believed to be illegal. *See Clark*, 9 F.3d at 332. With respect to pleading standards, *Clark*, citing *Krajsa v. Keypunch, Inc.*, 622 A.2d 355 (Pa. Super Ct. 1993), specifically notes that "the public policy exception to Pennsylvania's employment at-will doctrine did not apply where the plaintiff failed to point to a specific statute that either justified his act or made the one the employer proposed to

9

take unlawful." *Clark*, 9 F.3d at 330. Additionally, the plaintiff in *Clark*, in filing his complaint, originally pointed to both Pennsylvania and federal statutes for the alleged violation of public policy, *see Clark*, 9 F.3d at 326, something Medley has not done.

Medley also invokes language from *Fraser v. Nationwide Mutual Insurance Co.*, 352 F.3d 107 (3d Cir. 2003), to support her argument that she does not need to show that her termination from SugarHouse Casino was because of her refusal to engage in a crime, but merely because she was required to commit a crime as a condition of employment. In *Fraser*, the Third Circuit stated that, pursuant to Pennsylvania's public policy exception, "[a]n employer (1) cannot require an employee to commit a crime [and fire the employee for refusing to do so] . . . ." *Fraser*, 352 F.3d at 110 (quoting *Hennessy v. Santiago*, 708 A.2d 1269, 1273 (Pa. Super. Ct. 1998)) (alteration in original) (internal quotation marks omitted). Medley maintains that the bracketed language contained in the Third Circuit's opinion did not establish a "new federal requirement being improperly added to Pennsylvania law," (Pl.'s Resp. 6), but was simply added to fit the facts of *Fraser* into the previously stated public policy exception.

Medley's reliance on *Fraser* is also not helpful. As the Third Circuit stated in *Clark*, "The public policy exception to the doctrine of employment at-will does not exist, however, to protect the employee. Rather it is the protection of society from public harm, or the need to vindicate fundamental individual rights, that undergird an at-will employee's common law action for wrongful discharge in Pennsylvania." *Clark*, 9 F.3d at 331-32. Accordingly, to extend the public policy exception to the criminally complicit employee, as opposed to the employee who steadfastly refuses to participate in such activity, would be to protect an individual's interest in employment over the public's interest in the rule of law. Furthermore, *Clark* is clear that "an at-

10

will employee invoking Pennsylvania's public policy exception must show that his discharge offended a clear mandate of public policy by '. . . the employee's *refusal to engage in conduct prohibited by law.*'" *Id*. at 328 (quoting *Smith v. Calgon Carbon Corp.*, 917 F.2d 1338, 1344 (3d Cir. 1990)) (emphasis added). Therefore, it is not enough that Medley only alleges that she was asked to commit a crime, she must have refused such solicitation.

"The Supreme Court of Pennsylvania has emphasized that the public policy exception is not to be liberally construed." *Tanay v. Encore Healthcare, LLC*, 810 F. Supp. 2d 743, 738 (E.D. Pa. 2011) (citing *McLaughlin*, 750 A.2d at 287). In light of this guidance, where the plaintiff cannot point to a specific violation of public policy, I refuse to do so myself. More specific pleadings, however, could cure this defect. For that reason, while the wrongful termination claim will be dismissed against Tuck and the Corporate Defendants, I will do so without prejudice to Medley's right to amend her complaint to further develop this claim.[2]

### B. Count II: Intentional Infliction of Emotional Distress

In count II of her second amended complaint, Medley claims that intentional, extreme, and outrageous conduct by Defendants has resulted in both severe emotional distress and physical injury, thus constituting the tort of intentional infliction of emotional distress. Before examining whether Medley has asserted sufficient factual allegations to survive a motion to dismiss, it is necessary to discuss whether, in light of the Pennsylvania Worker's Compensation Act ("PWCA"), such a claim can survive as a matter of law.

---

[2]Leave to amend should be freely granted when justice so requires. *See* Fed. R. Civ. P. 15. In light of the fact that if this grant is exercised, Medley will be making her fourth attempt at filing a sufficient complaint, I remind her—and her counsel—that leave to amend does not persist in perpetuity.

"The [PWCA] provides an exclusive remedy for work related injuries." *Rorrer v. Cleveland Steel Container*, 712 F. Supp. 2d 422, 436 (E.D. Pa. 2010) (citing 77 Pa. Stat. Ann. § 481(a)). "This includes IIED claims." *Id*. (citing *Papa v. Franklin Mint Corp.*, 583 A.2d 826, 826-23 (Pa. Super. Ct. 1990). "There is, however, a narrow personal animus exception where the alleged injury was motivated by personal reasons as opposed to generalized contempt or hatred and did not arise in the course of employment." *Ahmed v. Lowe's Home Ctrs., Inc.*, 346 F. App'x 816, 821 (3d Cir. 2009) (citing 77 Pa. Stat. Ann. § 411; *Fugarino v. Univ. Servs.*, 123 F. Supp. 2d 838, 844 (E.D. Pa. 2000)). "To fit within this exception, the third party's or fellow employee's act must have been motivated by his animosity against the injured plaintiff. If the third party would have attacked a different person in the same position as the injured employee, the attack falls outside the [personal animus] exception." *Price v. Phila. Elec. Co.*, 790 F. Supp. 97, 100 (E.D. Pa. 1992) (quoting *Shaffer v. Proctor & Gamble*, 604 A.2d 289, 292 (Pa. Super. Ct. 1992)).

Here, based on the allegations in the second amended complaint, the only person who possibly could have harbored any personal animus against Medley would have been Weber. There is nothing alleged in the complaint that would suggest even a hint of personal animosity against Medley on behalf of Carlin, Patent, Hamilton, or Tuck, especially because all of the alleged conduct was work related and occurred in an employer-employee relationship.[3] *See*

---

[3]Medley alleges that Weber harassed her with profane and abusive language, threats of termination without justification, and degrading personal comments. Such allegations support a claim of IIED based on personal animus at this early stage in the proceedings. To the contrary, Medley's alleged interactions with Carlin, Patent, Hamilton, and Tuck were purely in an employer-employee relationship. Carlin and Patent attended one meeting with Medley, Hamilton's interactions were via email, and Tuck's interactions consisted of an investigation into possible wrongdoing and Medley's eventual termination. There is nothing in these alleged

*Moyer v. Kaplan Higher Educ. Corp.*, 413 F. Supp. 2d 522, 529 (E.D. Pa. 2006) (stating personal animus exception only applies where conduct is outside of employer-employee relationship). Accordingly, the IIED claim is dismissed with prejudice against the Individual Defendants as amendment would be futile. Simply adding the words "personal animus" to the complaint does not make it so. Medley does not allege any facts that would possibly support such a conclusion.

Reading the complaint in the light most favorable to Medley, I find allegations of Weber's "harassing and degrading personal comments," "profane and abusive language," and "threats to terminate [Medley's] employment without justification," could support a claim for IIED within the personal animus exception. (Sec. Am. Compl. ¶ 17.) Weber, however, is not a defendant in this action. The only issue that remains, then, is whether SugarHouse Casino can be held liable for Weber's actions on a theory of respondeat superior. In this case, it may not.

"In Pennsylvania, an employer may be held liable for the torts of its servants only if that conduct falls within the servant's scope of employment. This applies to intentional conduct as well as negligent conduct." *Shaup v. Jack D's, Inc.*, No. 03-5570, 2004 WL 1837030, *2 (E.D. Pa. Aug. 17, 2004) (internal citations omitted). "Conduct of a servant is not within the scope of employment if it is 'different in kind from that authorized, far beyond the authorized time or space limits, or too little actuated by a purpose to serve the master." *Id*. (quoting *Lezotte v. Allegheny Health Educ. and Research Found.,* No. 97-4959, 1998 WL 218086, *6 (E.D. Pa. May 1, 1998)). Furthermore, "if the act is done for personal reason, or in an outrageous manner, it is not done within the scope of employment." *Brezenski v. World Truck Transfer, Inc.*, 755 A.2d 36, 39 (Pa. Super. Ct. 2000).

---

interactions to suggest a relationship outside that of an employer and employee.

Here, Medley states in her complaint that "Ms. Weber's extreme and outrageous conduct toward [her] was the result of personal animus." (Sec. Am. Compl. ¶ 18.) Legal conclusions about Weber's conduct aside, the very argument that Weber's conduct was spurred by personal animus dissolves Medley's argument of respondeat superior. If, as Medley argues, Weber's actions were motivated by personal animus toward her, it follows that such conduct falls outside the scope of Weber's employment. *See Shaup*, 2004 WL 1837030, at *2 (finding employer not vicariously liable for employee's harassing conduct that was motivated by personal reasons). Therefore, SugarHouse Casino, as a matter of law, cannot be held vicariously liable for Weber's conduct. Thus, the IIED claim against SugarHouse Casino is dismissed with prejudice.

## IV. CONCLUSION

For the foregoing reasons, Defendants' motion to dismiss will be granted. An appropriate order follows.